UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 9:18-cv-80283-Dimitrouleas/Matthewman

ADT LLC & ADT US HOLDINGS, INC.,

    Plaintiffs,

        v.

NORTHSTAR ALARM SERVICES LLC,
and VISION SECURITY, LLC,

    Defendants.
_____/

## ADT'S OPPOSITION TO THE SUMMARY JUDGMENT MOTION

NorthStar moves for summary judgment on its affirmative defense that ADT has unclean hands that bar its claims in this case. [DE 76.] The motion fails because NorthStar offers no proof that ADT was the entity responsible for its alleged injuries. To the contrary: As shown below, ADT was not the actor responsible for the misconduct NorthStar alleges. Moreover, the motion fails as a matter of law because it misconstrues and misapplies the unclean hands doctrine. For both reasons, the motion must be denied.

## FACTS

NorthStar grounds its motion on incomplete testimony from three customers: Donald Holland, James Campbell, and Larry Ramsey. [DE 76 at 4-5.] NorthStar offers deposition excerpts from each to the effect that each was falsely induced by "ADT" to switch his alarm services from NorthStar to ADT. NorthStar's motion omits, however, that ADT did not make any of these three sales. In fact:

- Donald Holland was sold an alarm services contract by an independent vendor, Safe Home Control, Inc., of Orem, Utah, not by ADT. [DE 75-2 at 30.] A copy of Mr.

> Holland's contract with Safe Home Control is attached as <u>Exhibit A</u> to the Declaration of Barbara Runa, ("*Runa Declaration*") filed herewith.

- James Campbell was also sold an alarm services contract by Safe Home Control, not by ADT. [DE 75-3 at 24.]  A copy of Mr. Campbell's contract with Safe Home Control is attached as <u>Exhibit B</u> to the *Runa Declaration*.

- Larry Ramsey was sold an alarm services contract by another independent vendor, Evo Alarm of Rexburg, Idaho, not by ADT. [DE 75-4 at 23.]  A copy of Mr. Ramsey's contract with Evo is attached as <u>Exhibit C</u> to the *Runa Declaration*.

ADT acquires about half of its customers through direct sales by ADT's own sales staff to consumers. (*Runa Decl.* ¶ 3.)  The remainder are purchased from independent vendors who sell alarm services contracts on their own through ADT's dealer network. (*Runa Decl.* ¶ 4.) Hundreds of independent vendors sell alarm services contracts to consumers, and then offer those contracts to ADT for purchase. (*Runa Decl.* ¶¶ 4, 14.)  As ADT testified at deposition, an ADT dealer is "an independent alarm company who sells and installs independently and then sells the contract that they have procured to ADT for monitoring service."  Deposition of Marcia Gold dated April 11, 2019, at 13 (tr. at 49) ("*Gold Dep.*").

As provided in ADT's form Authorized Dealer Agreement, (*Runa Decl.* <u>Exhibit D</u> ("*ADA*")) companies that participate in the dealer program must offer such contracts first to ADT, but ADT is not obliged to purchase them. (*ADA* at 6, § 2.2.3.)  The ADA expressly provides that these third-party alarm services vendors are not agents of ADT:

> Authorized Dealer Status. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership or employment or franchise relationship between the parties hereto, nor shall either party have the right, power or authority to create any obligations or duty, express or implied, on behalf of the other party hereto.  ADT, Authorized Dealer and Owner understand and agree that Authorized Dealer's status under this Agreement is that of an independent contractor and that Authorized Dealer's status shall in no way be deemed to be that of an agent or employee of ADT or any of its Affiliates.  Authorized Dealer and Owner agree and acknowledge that, except for the procedures set forth herein and in the Guidelines.

>ADT does not control, direct or influence the manner in which Authorized Dealer and Owner operate their business and the means and methods Authorized Dealers use to generate Alarm Services Agreements are solely up to Authorized Dealer and Owner.  Therefore, in dealing with the public, Authorized Dealer and Owner shall at all times identify ADT as a provider of Electronic Event Detection Services and Authorized Dealer's capacity as an authorized but independent dealer of ADT.  At no time shall Authorized Dealer or Owner hold itself out as ADT or represent, in any fashion or nature whatsoever, that Authorized Dealer or Owner is ADT or an agent of ADT.

*ADA* § 2.4.

In fact, ADT rigorously adheres to these rules.  ADT takes care not to control, direct or influence the manner in which these vendors operate their businesses, consistent with the ADA provision quoted above:  "So do we have any say in who they hire, no.  Do we have any say in how they train, no.  Do we have any say in the hours in which the employees work, no.  There is a lot of operations that happen within a business and the ADT authorized dealer acts independently." (*Gold Dep*. at 21 (tr. at 81).)  Thus, for example:

- ADT does not provide accounting or financial services to the dealers.

- ADT does not provide human resources services to the dealers.

- ADT does not provide marketing services to the dealers.

- ADT does not provide any other back office services to the dealers.

- ADT does not control whom dealers should employ, or how many persons they should employ.

- ADT does not control the dealers' hours of operation.

- ADT does not control where a dealer should maintain its offices, or how to furnish or staff them.

- ADT does not control how dealers should "go to market" – whether they sell by telephone, or door-to-door, or through advertising, or through marketing call centers.

- ADT does not control how dealers conduct sales presentations.

- ADT does not control how dealers resolve customer disputes.

(*Runa Decl.* ¶ 12.)  These are all independent business decisions that ADT leaves to each individual dealer, (*Runa Decl.* ¶ 12) and ADT at all times takes care to adhere to the relationships created by the dealer agreements.  (*Runa Decl.* ¶ 13.)

Both Evo Alarm and Safe Home Control entered into alarm services contracts with Messrs. Holland, Campbell and Ramsey, and then submitted the contracts for sale to ADT pursuant to the ADA.  (*Runa Decl.* ¶¶ 6-9, Exhibits A-C.)  Consistent with this settled business practice, each of these customers' contracts prominently disclaimed, on the first page of each, any agency or employment relationship between ADT and the vendor, or any contractual relationship between the customer and ADT:

> **AUTHORIZED DEALER IS NOT AN AGENT OF ADT.**  Authorized Dealer is an independent dealer and is not controlled by ADT.  I agree that no agency, employer/employee or fiduciary relationship exists between ADT and Authorized Dealer. If ADT accepts this contract, it will be submitted to ADT for consideration and acceptance.  I expressly authorize submission of this Contract to ADT for consideration and acceptance by ADT.  If ADT accepts this Contract, ADT will become the supplier of the Services to Me in place of Authorized Dealer and this Contract will be between ADT and Me as of the commencement date of the Services.  No contractual relationship exists between ADT and Me unless and until ADT accepts this Contract to become the provider of the Services.  I understand that ADT reserves the right to reject this Contract, in which case ADT shall have no responsibility to Me.

(*Runa Decl.* Exhibits A-C (emphasis in originals).)

NorthStar's counterclaim acknowledged months ago the general proposition that ADT purchases many of its customer contracts through independent vendors, and alleged that the vendors are ADT agents.  [DE 21 at 13, ¶ 10.]  NorthStar has thus known from the time it first pled the counterclaim of this basic issue of agency:  Whether ADT is the party responsible for the torts NorthStar alleges.  NorthStar's *motion*, however, completely ignores this issue, and

offers no proof to establish that the conduct of the two vendors who entered into alarm services agreements with the three identified customers may be imputed to ADT as agents of ADT.

## ARGUMENT

Summary judgment will not lie where there exists a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). When deciding a summary judgment motion, a court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).

**I.    NorthStar Offers No Evidence To Establish That
       The Conduct It Alleges Is Attributable to ADT.**

It is NorthStar's burden under Rule 56(c)(1) to support its motion with admissible evidence. Yet NorthStar has offered no proof at all on an essential element of its claim that NorthStar itself identified in its own counterclaim: The relationship between ADT and the two nonparty vendors that sold alarm services contracts to the three customers upon whom NorthStar rests its motion. NorthStar's deposition evidence as well as the customer contracts offered by ADT show that Safe Home Control and Evo Alarm entered into the contracts with the identified customers. The proof shows that ADT did not sell these alarm contracts to the three identified customers. ADT purchased the contracts from Safe Home Control and Evo Alarm.

If ADT is at all liable, it would be under the rules of vicarious liability – that Safe Home Control and Evo Alarm acted as ADT's agents. While NorthStar's counterclaim alleges that some vendors are ADT agents, [DE 21 at 13, ¶ 10] NorthStar's summary judgment motion offers no proof to support that allegation in general, or its application to Safe Home Control or Evo

Alarm in particular.  NorthStar's motion thus fails *ab initio* because it offers *no* proof to connect the three customers' testimony to ADT – either directly as the seller of the systems, or vicariously as the sellers' principal.

Moreover, NorthStar *cannot* establish the requisite agency relationship as a matter of law on a contested motion for summary judgment.  Vicarious liability requires agency.  *Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189 (11th Cir. 2009).  "Agency requires: (1) consent to the agency by both principal and agent; and (2) the control of the agent by the principal."  *Id.; accord Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1377 (S.D. Fla. 2014) (Cohn, J.).  This is a fact-intensive inquiry that ordinarily precludes summary judgment.  "The existence of this agency relationship is a question of fact, however, and summary judgment on vicarious liability is appropriate only in cases where evidence of the relationship is clear and unequivocal."  *Legg,* 20 F. Supp. 2d at 1377, *following Johnson v. Unique Vacations, Inc.*, 498 Fed. Appx. 892, 894 n.3 (11th Cir. 2012).

There is no "clear and unequivocal" record here that establishes that either Safe Home Control or Evo Alarm occupies an agency relationship with ADT.  To the contrary:  The only record proof shows that ADT has *not* consented to any agency relationship with either vendor; that ADT has *no* contractual right to control either; and that ADT in practice does *not* control how either runs its respective business.  NorthStar's motion offers no record at all on this point.  ADT does control certain elements of all dealers' businesses regarding the dealers' use of ADT's trademarks, (*Gold Dep*. at 22 (tr. at 85)) or dealer conduct that might render ADT liable under statutes such as the Federal Debt Collection Practices Act.  (*Gold Dep*. at 27-28 (tr. at 105-06).)  Such kinds of control, however, do not create an agency relationship.  The Eleventh Circuit has expressly ruled, for example, that a trademark owner's duty to regulate its licensee's use of its

6

trademark does not make the licensee an agent of the owner, and does not render the owner vicariously liable for the licensee's infringements of other marks, or for other torts generally:

> But the licensor's duty to control a licensee's use of the licensor's own trademark cannot be blindly converted into a duty to prevent a licensee's misuse of another party's trademark. Such a wholesale conversion would impose responsibility upon a franchisor not for failing to maintain the integrity of its own trademark, but for failing to prevent another entity's violation of the law. We can discern no reason to impose such a burden upon a party that is, at best, secondarily responsible for any trademark infringement. As the Seventh Circuit has held:
>
>> The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of agency. Furthermore, the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose. The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question. It does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent.

*Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1520 (11th Cir. 1992), *quoting Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1327 (7th Cir.1979). Thus, "a trademark owner's failure to exercise control [over the licensee] does not subject the owner to affirmative liability in tort" for the licensee's misconduct, nor does the owner owe any duty to police the licensee's misuse of other marks. *Id.*

The kinds of control that ADT exerts over its dealers are not the kind of day-to-day control of their businesses sufficient to create an agency. *Mini Maid* expressly rejects the notion that ADT can be held vicariously liable for the torts of the hundreds of independent businesses that sell alarm system contracts to ADT. NorthStar's claim fails for its complete failure to establish ADT's responsibility for the torts it has alleged. Had NorthStar offered any such evidence, it would at best have created a dispute as to Safe Home's and Evo's status as ADT agents – a dispute for the jury to resolve at trial, not this Court on summary judgment. The Court

must therefore deny NorthStar's motion for its basic failure of proof on this essential element of NorthStar's affirmative defense.

**II.     The Unclean Hands Doctrine Does Not Apply Here.**

It is black-letter law that the unclean hands doctrine applies *only* where the plaintiff has engaged in misconduct *in the same transaction* for which the plaintiff seeks relief.  As Justice Kennedy wrote for a unanimous Supreme Court:  "Equity's maxim [holds] that a suitor who engaged in his own reprehensible conduct *in the course of the transaction at issue* must be denied equitable relief because of unclean hands."  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) (emphasis added), *citing* 2 Pomeroy, EQUITY JURISPRUDENCE § 397, at 90-92 (5th ed. 1941).  The Supreme Court looked to Pomeroy for a definitive statement of the doctrine, and Pomeroy emphasized:  "the dirt on his hands must be his bad conduct *in the transaction complained of*."  *Id*. § 399, at 95-97 (emphasis added).  Thus, it is not enough for the plaintiff's alleged misconduct to be of a kind with the transaction in suit – it must stand in "immediate and necessary relation" to the defendant's tort.  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 246 (1933); *accord, e.g., Gastaldi v. Sunvest Resort Communities, LC*, No. 08-cv-62076, 2010 WL 457243, at *9 (S.D. Fla. Feb. 3, 2010) ("it is not enough that the unclean-hands conduct is the same kind of conduct as the matter in litigation").  "Immediate" and "necessary" mean what they say – they require a showing that the plaintiff's claim would not exist but for the plaintiff's own misconduct.  *See Bank v. Nichols Creek Dev., LLC*, No. 3:13-cv-26-J-32JBT, 2015 WL 9474611, at *10 (M.D. Fla. Dec. 29, 2015).  Finally, the doctrine, when applied, operates only "to bar the suitor from invoking the aid of the equity court."  *McKennon*, 513 U.S. at 360; *accord ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 330 (1994).  It does not

apply to bar legal claims for money damages. *See Keystone Driller,* 290 U.S. at 244; *Nature's Products, Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1317 (S.D. Fla. 2013) (Dimitrouleas, J.).

These are longstanding equity rules. The decisions that occasionally depart from them are in derogation of the foundational rules of equity practice as stated by the Supreme Court.

### A. ADT seeks relief at law for damages.

NorthStar's unclean hands defense does not apply to bar ADT's claims for damages. ADT's claims for damages are claims at law to which the equitable defenses do not apply. The Supreme Court decisions conclusively hold that unclean hands cannot bar claims at law for damages, *see McKennon,* 513 U.S. at 360; *Keystone Driller,* 290 U.S. at 244, and this Court has so held in *Nature's Products* as well. This is a general rule that limits all equitable defenses – they bar only claims in equity, not actions at law. *See, e.g., Wehrman v. Conklin*, 155 U.S. 314, 326 (1894) (laches provides "a good defense in equity" but "no defense at law"); *accord SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 963 (2017) (same).

NorthStar, relying on a South Dakota decision, [DE 76 at 6] tilts against these longstanding divisions between law and equity. NorthStar argues that Section 35 of the Lanham Act provides for damages as an equitable remedy, and therefore subject to an unclean hands defense, because the statute instructs courts to adjust awards "subject to principles of equity." 15 U.S.C. § 1117. But that phrase states only the Court's statutory power to tailor damages awards to the circumstances of the case. *See, e.g., Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992) (affirming court's doubling of damages as an exercise in the trial court's equitable discretion under the statute); 5 MCCARTHY ON TRADEMARKS § 30:90 (5th ed. 2019). It does not transmogrify a legal claim into an equitable one. Over fifty years ago, the Supreme Court conclusively held, in a trademark action for an

9

accounting of profits under the Lanham Act, that "insofar as the complaint requests a money judgment it presents a claim which is unquestionably legal. We agree with that contention." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 476 (1962).

ADT's Lanham Act claim seeks money damages. [DE 1 at 14.] *Dairy Queen* and its progeny confirm that the Lanham Act does not somehow convert ADT's Section 43(a)(1)(A) claim at law for money damages into an equitable claim that might be barred by an unclean hands defense. Moreover, ADT's unfair competition claim, which NorthStar does not discuss in this respect, is unquestionably a common-law claim for damages. Because settled equity practice does not apply the unclean hands defense to claims at law for damages, and because ADT's claims plainly seek legal damages, the defense does not lie here.

### B.    The alleged misconduct does not occur in the same transaction.

Moreover, the affirmative defense does not lie here because ADT's alleged *but unproven* misconduct with respect to the three identified NorthStar customers did not occur in any of the transactions on which ADT brings its action. Put another way:  ADT's claims exist independent of its alleged misconduct with respect to the three identified customers. Put another way: ADT's alleged misconduct with respect to those three customers does not stand in "immediate and necessary relationship" with the transactions on which ADT sues NorthStar.

This Court rejected ADT's earlier reliance on these authorities in denying ADT's motion to strike NorthStar's unclean hands affirmative defense. [DE 42 at 6.] The Court there rejected as "overly narrow" ADT's contention that the alleged misconduct must occur in the same transaction as the transactions at issue in ADT's claim, and the Court relied upon *Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801 (11th Cir. 2015), to read this requirement out of the doctrine. [DE 42 at 6.] But the passage from *Bailey* that the Court quoted did not fully state the

10

doctrine's requirements because the omitted parts were not relevant to the facts there presented. Three pages later, *Bailey* added: "our holding is consistent with the Supreme Court's reasoning" in *McKennon*. *Bailey,* 776 F.3d at 804. In *McKennon*, as shown above, the Supreme Court in fact unanimously restated the traditional equity rule as requiring that that the plaintiff's misconduct occur "in the course of the transaction at issue." *McKennon*, 513 U.S. at 360. ADT respectfully asks the Court to revisit its ruling in DE 42 at 6, and to apply the doctrine here in the narrower fashion that is consistent with decades of settled equity practice as shown in the controlling Supreme Court decisions, and as authoritatively restated by Pomeroy.

In the end, NorthStar proposes an inequitable use of an equitable doctrine – it seeks to erect a complete bar to ADT's legal action for damages for thousands of likely NorthStar frauds on consumers based on only three incomplete claims of misconduct by third parties who did not work for ADT, whom ADT has not been shown to control, and whom ADT has not imbued with any apparent authority to act in ADT's behalf. NorthStar's unsupported allegations of ADT misconduct in these three transactions does not begin to meet its burden on summary judgment, to bar ADT from seeking damages for NorthStar's established frauds on countless hundreds of ADT customers in transactions wholly disconnected from the three transactions on which NorthStar rests its defense. The foundational unclean hands decisions nowhere provide for such sweeping relief unhinged from the transactions in which the misconduct supposedly occurred. NorthStar asks the Court for a dramatic and unprecedented expansion of the defense far beyond its confines in the chancery courts. This Court should not indulge it.

## CONCLUSION

The motion should be denied.

Dated:  April 17, 2019

Respectfully submitted,

**McNEW P.A.**

/s/ C. Sanders McNew
_____
C. Sanders McNew
mcnew@mcnew.net
Florida Bar No. 0090561
2385 NW Executive Center Drive, Suite 100
Boca Raton, Florida  33431
Tel:  (561) 299-0257

**SHOOK, HARDY & BACON, LLP**

Eric S. Boos
eboos@shb.com
Florida Bar No. 0107673
Citigroup Center, Suite 3200
201 S. Biscayne Boulevard
Miami, Florida  33131
Tel: (305) 358-5171

*Counsel for the Plaintiffs, ADT LLC*
  *-and- ADT US Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this seventeenth day of April, 2019, I caused a true and correct copy of the foregoing Motion to be served by CM/ECF on all parties listed to receive electronic service for this case.

s/ C. Sanders McNew
_____
C. Sanders McNew